# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# HATTIESBURG DIVISION

**JOHNNIE FRILEY, et al.**                                                          **PLAINTIFFS**

**v.**                      **CIVIL ACTION NO. 2:96-CV-172-KS-MTP**

**THE HOUSING BENEFITS PLAN, et al.**                              **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, the Court **grants** Plaintiff's Motion to Enforce [111] the parties' settlement agreement. The Court finds that it is medically necessary for Plaintiff, Joseph Friley, to receive skilled nursing care twenty-four hours a day.

## I. BACKGROUND

Plaintiff is an adult who suffers from profound mental disability and several serious medical conditions. Until recently, Plaintiff was ambulatory, but his mobility has apparently decreased in recent months. He is unable to perform the simplest of tasks on his own, dependant upon others for all of his personal hygiene needs. He can not get dressed, eat, or get into or out of bed without assistance.

Plaintiff was born prematurely. As a result, his lungs are underdeveloped, causing him to suffer frequent respiratory problems, including infection and pneumonia. He is on continuous oxygen, and he receives frequent chest physiotherapy, in which a nurse beats his back and side to break up sputum in his chest. Plaintiff is unable to discern when he must cough to expel sputum from his lungs, and he depends on nurses to prompt him to do so. Nurses must also wake Plaintiff during the night to

break up and prompt him to expel the sputum in his lungs.

Plaintiff has a gastric feeding tube ("G-tube") inserted through his abdomen to deliver nutrition directly to his stomach. The G-tube must be flushed and cleaned periodically, and the area of skin surrounding it must be cleaned and cared for as needed. Plaintiff is also a diabetic. Both his blood sugar and nutritional needs must be closely monitored, and he receives medication for his diabetes when needed. Plaintiff also has chronic seizure disorder and gastrointestinal issues.

Plaintiff receives as many as eleven to twelve different medications twice a day. Some of them require a prescription, while some do not. Some of them are administered on a regular basis, while others are administered as needed. Every four hours, Plaintiff receives albuterol treatments – inhaled in vapor form through a nebulizer.

Plaintiff has no living family members or friends to care for him. Before he died, Plaintiff's father entered into a settlement agreement with Defendant. The parties agreed that Plaintiff would be covered under an insurance benefits plan, subject to his timely payment of the premiums. Defendant expressly waived any limitation which might exist with regard to nursing care for Plaintiff, except for limitations concerning medical necessity. Accordingly, Plaintiff has received in-home nursing care from Private Duty Nursing ("PDN") twenty-four hours a day from December 1996 to present.

In the spring and summer of 2010, Defendant's third-party administrator submitted three different requests for records related to the nursing services provided

to Plaintiff by PDN. Defendant also submitted a request for a formal in-home medical and psychiatric evaluation of Plaintiff, but the parties were unable to agree on a doctor to conduct the evaluation. Plaintiff, through his guardian ad litem, eventually filed a motion to enforce the settlement agreement, representing that Defendant had failed to pay PDN's charges.

The parties' dispute reduces to a single issue: whether it is medically necessary for Plaintiff to receive skilled nursing care twenty-four hours a day. If such care is medically necessary for Plaintiff, Defendant is obligated to pay for it under the terms of the settlement agreement. If it is not medically necessary, Defendant may pay for some lesser (and cheaper) level of home health care. The parties spent the past two years attempting, in good faith, to settle this matter by securing Plaintiff's admission to a group home facility. Unfortunately, each facility the parties contacted was either unable or unwilling to admit Plaintiff at this time, but Plaintiff is currently on the waiting list for a facility that is both willing and qualified to admit him. Accordingly, the Court held a hearing on February 11, 2013, at which both parties presented evidence as to the amount and level of care that it is medically necessary for Plaintiff to receive.

## II. DISCUSSION

The Court has the inherent power and discretion to enforce the settlement agreements reached in cases before it. *Harmon v. Journal Publ. Co.*, 476 F. App'x 756, 757 (5th Cir. 2012) (citing *Bell v. Schexnayder*, 36 F.3d 447, 449 (5th Cir. 1994)). The parties agree that the sole issue for the Court's determination is whether it is

3

medically necessary for Plaintiff to receive twenty-four hours a day of skilled nursing care. After reviewing the evidence, the Court concludes that it is medically necessary for Plaintiff, Joseph Friley, to receive skilled nursing care twenty-four hours a day. The parties introduced a wide variety of evidence, but the Court's opinion will highlight the items it believes to be most significant.[1]

A.  *Shay Tubbs*

Shay Tubbs – one of the PDN nurses who cares for Plaintiff – provided testimony regarding the duties she performs on a daily basis. Throughout the course of a day, she must perform multiple assessments of Plaintiff's temperature, pulse, breathing, oxygen level, blood sugar, and G-tube placement and hygiene. She monitors his general appearance and color, as changes could indicate problems associated with his oxygen and/or blood sugar level. She also checks the pressure in his $O_2$ tubing, to ensure that he receives an appropriate amount of oxygen.

She performs a type of physical therapy at least twice a day, helping him move and stretch his extremities, and she also performs chest physiotherapy to break up the sputum in his lungs. She administers up to twelve different medications at least twice

---

[1] At trial, Plaintiff argued that it would violate Mississippi law for home health workers who are not licensed nurses to administer and/or execute the treatment plan provided by Plaintiff's treating physician. The Court instructed the parties to provide supplemental briefing on the application, if any, of the Mississippi Nursing Practice Law. Miss. Code Ann. § 73-15-1, *et seq*. After consideration of the evidence presented at trial, the Court concludes that it is not necessary to address Plaintiff's arguments concerning the Nursing Practice Law. Regardless of the statute's implications, Plaintiff demonstrated by a preponderance of the evidence that it is medically necessary for him to receive twenty-four hours a day of skilled nursing care.

a day. She gives him albuterol treatments, inhaled in vapor form through a nebulizer, every four hours. She must also administer Actos, a prescription drug, on an as-needed basis to control Plaintiff's blood sugar. While Plaintiff is sleeping, she monitors his breathing, adjusts his position as needed to facilitate breathing, and wakes him periodically for respiratory treatment. In addition to these services, she also cooks, cleans, and does laundry for Plaintiff. However, she testified that, regardless of what she is doing at any given time, she must always pay attention to Plaintiff, as his medical condition can quickly change.

In the Court's opinion, Tubbs' testimony demonstrated that whoever cares for Plaintiff is required to do more than simply "babysit" him. Plaintiffs' nurses have discretion to administer both over-the-counter and prescription drugs as needed, and they are required to use their education and training to determine Plaintiff's medical needs. Indeed, Tubbs testified that she uses her nursing skills to make a number of judgment calls each day, including but not limited to: whether Plaintiff's oxygen levels are too low, whether his blood sugar is too low or too high, whether he is dehydrated, whether he's experiencing respiratory problems, and whether his G-tube needs to be cleaned. Her testimony also indicated that the number of medical conditions suffered by Plaintiff increases the number of problems that may arise on a daily basis. Furthermore, Tubbs testified that Plaintiff's condition can change quickly, requiring the prompt application of her education and training.

The Court will also briefly address one aspect of Tubbs' testimony highlighted by Defendant at trial. Plaintiff's nurses perform numerous non-skilled duties every

5

day, including but not limited to cooking, cleaning, and doing his laundry. Defendant argued at trial that this indicates that Plaintiff does not need twenty-four-hour nursing care. The Court disagrees. Although Plaintiff's nurses may perform a number of non-skilled tasks, the evidence demonstrated that they are constantly on call to exercise their nursing skills. According to Tubbs, Plaintiff's nurses must remain vigilant at all times, as his condition can change at any moment and with little warning. Therefore, it is irrelevant that Plaintiff's nurses perform some unskilled tasks, as it is medically necessary for Plaintiff to have their skills available twenty-four hours a day.

## B.     *Luanne Trahant*

Plaintiff introduced testimony from Luanne Trahant, a nurse practitioner and expert in the field of nursing. As a precursor to her testimony, Trahant provided two expert reports, which were also introduced as evidence at trial. In the first, dated January 11, 2012, she stated that it was her "opinion within a reasonable degree of nursing probability that Joseph Friley continues to require skilled nursing intervention on a daily basis based on his medical conditions and changing health status." She further believed that Plaintiff requires such care twenty-four hours a day in his own home, and that "PDN's services minimize Joseph's acute hospitalizations and illnesses and enhance his quality of life through daily, skilled observation and interventions." In Trahant's second report, dated May 10, 2011, she responded to the contrary opinion of Dr. Steven Stogner and reiterated her previous opinions.

At trial, Trahant – like Tubbs – noted Plaintiff's many medical conditions and the potential complications that could arise from them. She noted that many of

6

Plaintiff's medications are taken on an as-needed basis, requiring the nurses to assess his condition before administering them. She also estimated that Plaintiff's nurses were required to provide some form of skilled nursing care at least once every two hours, sometimes for a half hour to a full hour at a time. She further noted that this estimate did not account for the constant need to observe and assess Plaintiff while performing mundane household tasks.

Trahant directly addressed the fact that Dr. Stogner, whose testimony and opinion the Court will discuss below, disagreed with her on the amount of skilled nursing care required to address Plaintiff's needs. She admitted that she was not qualified to disagree with Dr. Stogner on the subject of medical necessity, but she asserted that she was "in the best position to make the determination as to what type of nursing care Joseph needs to meet those medical needs." She also testified that, typically, when a doctor orders home health treatment for a patient, a nurse evaluates the patient and determines the scope of care necessary for the patient. She stated: "[T]ypically, the physician is just going to write 'home health services.' They're not going to write [that] they want a nurse five days a week and an aide two days a week. They usually just write home health services, and you go out and evaluate." In the Court's opinion, this testimony lends weight to the testimony offered by both Tubbs and Trahant.

## C. Dr. Paul Fineburg

Dr. Paul Fineburg, Plaintiff's treating physician, did not testify at trial, but Plaintiff introduced the transcripts of two depositions of Dr. Fineburg into evidence.

7

In summary, Dr. Fineburg testified that he believes, to a reasonable degree of medical certainty, that Plaintiff needs skilled nursing care twenty-four hours a day.

Dr. Fineburg noted Plaintiff's multiple chronic illnesses, specifically mentioning his respiratory problems. He stated that Plaintiff's nurses are able to assess him quickly and determine whether he needs to see a doctor when his condition changes – a benefit that a less skilled caretaker would not provide. Dr. Fineburg also testified that Plaintiff's nurses determine whether his oxygen levels are sufficient, and whether to administer medications prescribed on an as-needed basis. He believed that it was necessary for a nurse to monitor Plaintiff's vital signs, such as blood sugar, respiratory rate, blood pressure, and heart rate. According to Dr. Fineburg, someone lacking the education and training of a nurse would not be able to provide these necessary types of care.

Dr. Fineberg signed off on a treatment plan for Plaintiff that outlines his medications and requires "private duty nursing 24 hours per day." However, Dr. Fineburg testified that the treatment plan was not produced by him or anyone in his office. Rather, PDN's nurses fax or hand-deliver it to him for signature. Nevertheless, Dr. Fineburg affirmed that he believed the treatment plan was appropriate, and that it was what Plaintiff needed.

### D.    *Gaye Ragland*

Gaye Ragland is a registered nurse designated as an expert witness by Defendant. Although she did not testify at trial, Plaintiff offered a transcript of her deposition as evidence at trial. In summary, Ragland agreed that Plaintiff needed

8

nursing care and supervision twenty-four hours a day, but she did not agree that he needed it on a one-on-one basis in his home. Rather, she believed that Plaintiff's needs could best be served in a group facility where he would have constant access to skilled nursing care, plus other social and psychological benefits which he does not currently enjoy.

Ragland testified that all of the medications listed on Plaintiff's treatment plan did not require skilled nursing judgment to administer, but she admitted that some of them did. Although she admitted that Plaintiff's care "meets the criteria of skilled nursing," she testified that the majority of the care he receives on any given day is merely custodial in nature. However, she acknowledged that Plaintiff has "very fluid" needs. On one day, he may require skilled nursing care, but on another he may not. She agreed that Plaintiff's conditions can worsen very quickly, and that it was necessary to monitor his vital signs throughout any given day.

### E. Dr. Steven Stogner

In September 2010, the Court suggested that Dr. Steven Stogner conduct an independent medical examination of Plaintiff and provide an opinion as to the level of medical care he needs. Dr. Stogner examined Plaintiff in January 2011 and provided a report in March 2011. Dr. Stogner's report contains a full account of the medical conditions already discussed above. He provided the following opinion:

> The main assistance needed by Mr. Friley does not require skilled-level nursing in his home. While he does require full-time assistance, his 24 hour daily needs can be met with custodial-level caretakers. However, he does need evaluation by a licensed practical nurse (LP) either with home health or at a local physician's office 2 times per week and as needed to

9

> assist with preparation of medications, and to make sure that his medical regimens are being followed (such as glucose monitoring, etc.). The home health nurse or office nurse could communicate with Mr. Friley's primary care physician or NP on a regular and as needed basis.

Defendant later designated Dr. Stogner as an expert witness, and he testified at trial. His trial testimony was consistent with his report. He believes that the majority of Plaintiff's needs can be met with unskilled custodial care, supplemented by visits to a primary care physician or nurse practitioner twice a week and as needed. Dr. Stogner testified that many of the medications on Plaintiff's treatment plan were available over-the-counter, and he specifically noted that patients' family members frequently administer Albuterol vapor treatments through a nebulizer.

### III. CONCLUSION

In the Court's opinion, Plaintiff demonstrated, by a preponderance of the evidence, that it is medically necessary for him to receive skilled nursing care twenty-four hours a day. The Court found the testimony of Shay Tubbs and Luanne Trahant especially persuasive on this point. Both Tubbs and Trahant addressed the practical realities of caring for an individual with Plaintiff's conditions on a day-by-day basis. Furthermore, it is noteworthy that Defendant's own expert witness, Gaye Ragland, concluded that Plaintiff needed twenty-four hour nursing care, even if she would rather it be provided in a group facility. All the witnesses agree that Plaintiff's condition can change quickly, and Plaintiff offered evidence that it requires a nurse's eye to track these changes. Indeed, Plaintiff offered a considerable amount of evidence that he requires constant assessment, and that some of his medications and treatments

10

require determinations that unskilled custodians lack the education and training to make.

The only evidence presented by Defendant relevant to these issues was Dr. Stogner's testimony. The Court gave Stogner's opinion due consideration, but, in the end, the collective testimony of Fineburg, Trahant, Tubbs, and Ragland outweighed it. Additionally, at the time of trial it had been almost two years since Dr. Stogner examined Plaintiff, and Tubbs testified that Plaintiff's condition has deteriorated during that time period. Although PDN's nurses provide some mundane, custodial services to Plaintiff, their presence is necessary to monitor his condition, assess his current needs, and administer treatments and medication.

Therefore, for all of the reasons stated above, the Court **grants** Plaintiff's Motion to Enforce [111] the parties' settlement agreement. The Court finds that it is medically necessary for Plaintiff, Joseph Friley, to receive skilled nursing care twenty-four hours a day. Defendant shall, subject to the terms and conditions of the settlement agreement, pay claims for such services. The Court hopes, however, that the parties will not stop trying to secure Plaintiff's admission to a group facility. Nurse Ragland's testimony concerning the many benefits of such a facility – including, but not limited to social activities, nutritionists, physical therapy, speech therapy, religious services, and exercise – was perhaps the most sensible and persuasive evidence in the record.

SO ORDERED AND ADJUDGED this 11th day of March, 2013.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE